17 MAG 3152

ORIGINAL

U.S. DISTRICT COURT FILED APR 27 2017 S.D. OF N.Y.

Approved: ____________________
MATTHEW PODOLSKY
Assistant United States Attorney

Before: HONORABLE KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

DOC #________

UNITED STATES OF AMERICA

- v. -

PEDRO GARCIA PENA,
a/k/a "Nano," and
JOSEPH GABRIEL VALLEJO,

Defendants.

**COMPLAINT**

Violations of
18 U.S.C. §§ 1951,
924(c)(1)(A)(i), and 2;
21 U.S.C. § 846

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

SEAN AGUILERA, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

**COUNT ONE**
**(Conspiracy to Commit Hobbs Act Robbery)**

1. From in or about March 2017 up to and including in or about April 2017, in the Southern District of New York and elsewhere, PEDRO GARCIA PENA, a/k/a "Nano," and JOSEPH GABRIEL VALLEJO, the defendants, unlawfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, PENA and VALLEJO conspired to commit the armed robbery of individuals believed to be narcotics dealers in Manhattan, New York.

(Title 18, United States Code, Section 1951.)

**COUNT TWO**
**(Narcotics Conspiracy)**

2. From in or about March 2017 up to and including in or about April 2017, in the Southern District of New York and elsewhere, PEDRO GARCIA PENA, a/k/a "Nano," and JOSEPH GABRIEL VALLEJO, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

3. It was a part and an object of the conspiracy that PEDRO GARCIA PENA, a/k/a "Nano," and JOSEPH GABRIEL VALLEJO, the defendants, and others known and unknown, would and did distribute and possess with the intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

4. The controlled substance that PEDRO GARCIA PENA, a/k/a "Nano," and JOSEPH GABRIEL VALLEJO, the defendants, conspired to distribute and possess with the intent to distribute was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

**COUNT THREE**
**(Firearms Use, Carrying, and Possession)**

5. On or about April 26, 2017, in the Southern District of New York and elsewhere, PEDRO GARCIA PENA, a/k/a "Nano," and JOSEPH GABRIEL VALLEJO, the defendants, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, namely, the robbery conspiracy charged in Count One of this Complaint, and during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, namely, the narcotics conspiracy charged in Count Two of this Complaint, knowingly did use and carry a firearm, and, in furtherance of such crime, did possess a firearm, and did aid and abet the use, carrying, and possession of a firearm.

(Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

6. I am a Special Agent with the DEA and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of reports, records, and video footage. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

7. During the course of this investigation, I and other law enforcement agents have worked with a confidential source ("CS-1"[1]), who in the past has conducted, at the direction of law enforcement, at least one controlled purchase of a firearm from an individual CS-1 knows as "Nano." On or about March 23, 2017, I and other law enforcement officers spoke with CS-1, who stated, in substance and in part, the following:

a. "Nano" had recently contacted CS-1 and asked CS-1, in substance and in part, if CS-1 would help perpetrate a home invasion robbery ("Robbery-1") by serving as a driver.

b. "Nano" further told CS-1, in substance and in part, that (1) the goal of Robbery-1 would be to steal narcotics located in a particular apartment in the Bronx, New York; (2) approximately two other co-conspirators would be involved in the robbery scheme; and (3) the robbers would be armed.

8. Based on my discussions with other law enforcement officers who have spoken with CS-1 and monitored a recording device, as well as my own surveillance, I have learned that, on or about March 27, 2017, CS-1 and "Nano" met in person at a particular location in the Bronx, New York. I have further learned that during that meeting, which was recorded, "Nano" stated, in substance and in part, the following:

---

[1] CS-1 assists law enforcement investigations in return for monetary payments. CS-1 has been working with law enforcement for approximately 2 years, and CS-1's information has proven reliable and has been corroborated by other independent evidence, including, among other things, surveillance by law enforcement as described herein.

a. Robbery-1 would occur during the early morning hours of the week from on or about March 27 through on or about March 31, 2017. "Nano" believed that there would be an exchange of cocaine for United States currency, and that a source (the "Source") would provide to "Nano" a three-hour window during which "Nano" could execute the robbery of the narcotics and cash.

b. Five individuals would participate in Robbery-1, including CS-1, who would serve as the driver. The robbers would be armed with firearms, which "Nano" referred to as "tools."

c. "Nano" also intended to rob an individual in the Hartford, Connecticut area for approximately $35,000 in United States currency, and requested that CS-1 serve as the driver.

9. Based on my discussions with other law enforcement officers who have spoken with CS-1 and monitored a recording device, as well as my own surveillance, I have learned that, on or about April 3, 2017, CS-1 and "Nano" met in person at a particular location in the Bronx, New York. I have further learned that during that meeting, which was recorded, the following occurred:

a. "Nano" stated, in substance and in part, that he had not heard further from the Source regarding Robbery-1, and believed that the Source had been arrested.

b. "Nano" stated, in substance and in part, that if CS-1 needed, or knew of anyone else that required a murder for hire, "Nano" would be willing carry out such a murder for approximately $150,000.

c. At the direction of law enforcement, CS-1 stated, in substance and in part, that he was aware of a drug trafficking organization in the New York City area that they (CS-1 and "Nano") could rob. "Nano" stated, in substance and in part, that he ("Nano") could carry out the robbery alone if need be.

d. Shortly thereafter, CS-1 placed a call to a second confidential source ("CS-2"[2]), and introduced CS-2 to "Nano" by telephone.

10. Based on my discussions with other law enforcement officers who have spoken with CS-1 and CS-2 and monitored a recording device, as well as my own surveillance, I have learned that, on or about April 5, 2017, CS-1, CS-2, and "Nano" met in person at a particular location in the Bronx, New York. I have further learned that during that meeting, which was recorded, the following occurred:

a. At the direction of law enforcement, CS-2 proposed, in substance and in part, a robbery of armed narcotics dealers ("Robbery-2").

b. "Nano" stated, in substance and in part, that he was willing to carry out Robbery-2, and that he could provide a vehicle and firearms, which he referred to as "tools."

c. "Nano" further stated, in substance and in part, that he had uniforms that resemble law enforcement uniforms to wear during the robbery.

d. CS-1, CS-2, and "Nano" agreed to split the narcotics they would take four-ways, between the three of them and unknown individual who would assist in Robbery-2.

11. Based on my discussions other law enforcement officers who have spoken with CS-1 and CS-2 and monitored a recording device, as well as my own surveillance, I have learned that, on or about April 25, 2017, CS-1, CS-2, and "Nano" met in person at a particular location in the Bronx, New York. I have further learned that during that meeting, which was recorded, CS-2 explained, in substance and in part, that Robbery-2 would involve taking approximately 10-15 kilograms of cocaine from drug dealers, and CS-1, CS-2, and "Nano" agreed that they would split the approximately 10-15 kilograms three ways between them.

---

[2] CS-2 assists law enforcement investigations monetary payments. CS-2 has been working with law enforcement for approximately 2 years, and CS-2's information has proven reliable and has been corroborated by other independent evidence, including, among other things, surveillance by law enforcement as described herein.

12. Based on my discussions with other law enforcement officers who have spoken with CS-1 and CS-2 and monitored a recording device, as well as my own surveillance, I have learned that, on or about April 26, 2017, the following occurred:

a. CS-1 and "Nano" spoke by telephone several times, during which telephone calls CS-1 asked, in substance and in part, whether "Nano" wanted to carry out Robbery-2, and "Nano" stated, in substance and in part, yes. CS-1 stated, in substance and in part, that "Nano" should meet CS-1 at a particular location in Manhattan, New York (the "Meeting Place"), from where they would travel to the location of Robbery-2.

b. Subsequently, I and other agents observed a black Toyota sedan ("Car-1"), which "Nano" informed CS-1, by telephone, was the car in which he ("Nano") was traveling, arrive in the vicinity of the Meeting Place. CS-1 observed "Nano" sitting in the back seat of Car-1 and two other individuals also inside of Car-1. "Nano" told CS-1, by telephone, that "Nano" should follow him (CS-1).

c. CS-1, who was with CS-2 in a car ("Car-2"), exited the parking lot of the Meeting Place and Car-1 followed. Shortly thereafter, Car-2 pulled over, and CS-1 exited Car-2 and approached the rear door of Car-1, where "Nano" was sitting. "Nano" exited Car-1 and spoke to CS-1, with the door to Car-1 remaining open. CS-1 asked both "Nano" and the individual sitting in the rear seat of Car-1, in substance and in part, whether they were prepared to carry out Robbery-2 and were armed, to which questions "Nano" and the other individual sitting in the rear seat of Car-1 indicated that the answer was yes. CS-1 returned to Car-2, and both Car-1 and Car-2 resumed driving, with Car-1 following Car-2.

d. Soon thereafter, law enforcement officers pulled Car-1 over, and discovered the following:

i. In Car-1, PEDRO GARCIA PENA, a/k/a "Nano," and JOSEPH GABRIEL VALLEJO, the defendants, were sitting in the rear seat where CS-1 had approached "Nano."

ii. In the trunk of Car-1, there was a bag, in which there was a computer bag, in which there was a Smith & Wesson .357 magnum revolver, with rounds loaded, inside of a sock, and a Zoraki 918-T 9 millimeter handgun, also inside of a sock.

WHEREFORE, I respectfully request that PEDRO GARCIA PENA, a/k/a "Nano," and JOSEPH GABRIEL VALLEJO, the defendants, be imprisoned or bailed, as the case may be.

SPECIAL AGENT SEAN AGUILERA
DRUG ENFORCEMENT ADMINISTRATION

Sworn to before me this
27th day of April, 2017

THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK